### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES YOUBOTY                                :
                                             :          CIVIL ACTION
          v.                                 :          No. 26-5013
                                             :
SECRETARY MARKWAYNE MULLIN, *et al.*  :

### MEMORANDUM

**McHUGH, J.**                                               **July 28, 2026**

This is a habeas action challenging the actions of Immigrations and Customs Enforcement (ICE).  Petitioner James Youboty is a non-citizen subject to a final order of removal, on which action has been withheld because of risk to him if he were to be returned to his native Liberia.  He has been living in Philadelphia subject to an Order of Supervision (OSUP) since 2000.  ICE recently revoked the OSUP on the ground that there is a significant likelihood he may be removed in the reasonably near future based on an agreement between the United States and the nation of Ghana to accept deportees from West African nations.

Mr. Youboty's initial motion complained of due process violations in vague terms stemming from "mandatory, and unreviewable incarceration without an individualized custody determination," and a refusal to "consider less restrictive alternatives."  Br. at 9, ECF 1.  His reply focuses more precisely on a relevant legal issue, lack of notice that to Ghana is the intended destination.  *See generally* Reply Br., ECF 6.

The Government's legal authority to detain Mr. Youboty is clear under 8 U.S.C. § 1231(a)(2)(A).  The statute provides for a 90-day "removal period," 8 U.S.C. § 1231(a)(1)(A), and further provides that the removal period can be extended if it is "reasonably necessary" to effectuate removal, *id.* § 1231(a)(6).  In *Zadvydas v. Davis*, the Supreme Court held that post-

removal period detention up to six months is "presumptively reasonable." 533 U.S. 678, 701 (2001).

A district court's jurisdiction is exceedingly narrow. 8 U.S.C. § 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999). But due process still applies, *see Lasko v. Rife, et al.*, No. 26-3998, 2026 WL 2098256, at *2 (E.D. Pa. July 20, 2026); *Funes v. Francis*, 810 F. Supp. 3d 472, 498 (S.D.N.Y. 2025), and the Government must follow its own regulations, *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–68 (1954).

Revocation of an order of supervised release can be based on violations of its terms or on "changed circumstances" that show "a significant likelihood that the alien may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(1)–(2). To revoke such an order of supervised release, applicable regulations require both (1) adequate notice of the reasons for the revocation and (2) an "initial informal interview promptly after his or her return to [ICE] custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." *Id.* § 241.13; *see also id.* § 241.4(l) (providing further reasons and procedures for revocation of supervised release).

The Government's briefing asserts that ICE satisfied these regulations. *See* Resp. at 8–10. Attached to its Response are a revocation notice, an "informal interview sheet," and a revocation justification worksheet. *See* ECF 5-4, 5-6, & 5-7. The interview sheet memorializes that an ICE agent talked to Mr. Youboty about the broad outlines of his immigration history and his life since 2000. *See* ECF 5-6 at 2. None of the records the Government submitted provides any indication

that Ghana was identified or discussed as his destination at any point.  Presumably that is because, as detailed by ICE's Acting Unit Chief managing enforcement and removal for Africa, the State Department has received and verified "diplomatic assurances" that deported aliens will not face persecution and torture in Ghana.  ECF 5-8 at 3.  But for due process purposes, this does not suffice, because for all practical purposes the revocation notice's non-specific reference to "changed circumstances" did not provide Mr. Youboty with any meaningful information concerning the reason for the revocation of the order of release.

Courts reviewing the revocation regulations have looked to the requirements of notice and informal interview as embodying aliens' procedural rights, albeit reduced and conditional, in not being detained and deported without clear notice and an opportunity to be heard.  *See, e.g.*, *Funes v. Francis*, 810 F. Supp. 3d 472, 498 (S.D.N.Y. 2025).  The governing regulation links the notice of the reasons for revocation with the interview, stating that the interview must give the alien the chance to respond to the Government's reasons for revocations.  *See* 8 C.F.R. § 241.13.

Courts interpreting this regulation have concluded that the notice and interview procedures must combine to show a meaningful chance to dispute the Government's determination.  *See, e.g., Dudamel v. Jamison*, No. 26-361, 2026 WL 498612, at *4 (E.D. Pa. Feb. 23, 2026) (Quiñones Alejandro, J.) ("[I]n order to revoke conditional release, the Government must provide adequate notice and 'promptly' arrange an 'initial informal interview . . . to afford the [noncitizen] an opportunity to respond to the reasons for the revocation stated in the notification.'").  Because the notice and the interview are two parts of the same process due to aliens, the notice of revocation must explain enough of the Government's rationale for the revocation that the interview can then give the person the chance to respond to the issues raised in the revocation, including through written statements, questions, and evidence.  *See Funes*, 810 F. Supp. 3d 497–98.

3

Relatedly, due process requires a *meaningful* opportunity to respond to those specific reasons through the interview.  *See Grigorian v. Bondi*, 824 F. Supp. 3d 1243, 1255 (S.D. Fla. 2025) ("The opportunity to contest detention through an informal interview is not some ticky-tacky procedural requirement; it strikes at the heart of what due process demands"); *see also Martinez v. Jamison*, No. 26-0718, 2026 WL 700335, at *6 (E.D. Pa. Mar. 12, 2026) (Kenney, J.) (concluding insufficient evidence of a "meaningful" interview creates a "fatal flaw in due process record").

When a third country is involved, "a noncitizen must be given sufficient notice of a country of deportation that, given his capacities and circumstances, he would have a reasonable opportunity to raise and pursue his claim for withholding of deportation." *Nguyen v. Scott*, 796 F. Supp. 3d 703, 727 (W. D. Wash. 2025).  Just declaring changed circumstances or a newfound travel document is not enough.  *See Sarail A. v. Bondi*, 803 F. Supp. 3d 775, 779–80, 783–84 (D. Minn. 2025) (finding a notice of revocation that only mentioned "changed circumstances" was insufficient to notify an alien of their intended deportation to a third country); *Torres-Jurado v. Biden*, No. 19-3595, 2023 WL 7130898, at *4 (S.D.N.Y. Oct. 29, 2024) (finding a notice of revocation insufficient where it only stated that a travel document was forthcoming).

Here, the notice form ICE gave to Mr. Youboty specified only that circumstances had changed because the Government now believed his removal could be accomplished in the foreseeable future, and the revocation worksheet elaborated by saying that a travel document had been secured for him.  Nowhere is there any indication that they would be sending Mr. Youboty to Ghana, or even to a third country generally.  And the details contained in the record of the informal interview do not fit with there having been a discussion of any country other than Liberia. As set forth in Mr. Youboty's Reply, some agents had "stopped to talk to him" about his life and

4

were "very friendly," which comports with the discussion summarized in the interview sheet. Reply Br. at 7.

This failure to give notice of the change in destination that constitutes the change in circumstances has further substantive import. In 2025, Mr. Youboty's withholding of removal because of danger in Liberia was re-affirmed. *See* ICE File at 4, ECF 5-1. As a general matter, when an alien subject to a final removal order faces removal to a third country, 8 U.S.C. § 1231(b) governs the order of destination countries the Government must proceed through. Specifically, 8 U.S.C. § 1231(b)(3)(A) originated in Congress's domestic adoption of the principles of the 1951 United Nations Convention Relating to the Status of Refugees. *See Dia v. Raycraft*, No. 26-1054, 2026 WL 1476507, at *5 (W.D. Mich. May 27, 2026). Elsewhere, regulations permit aliens to challenge deportation destinations under the Convention against Torture. *See, e.g.*, 8 C.F.R. § 1208.16(c).[1] And the Third Circuit has acknowledged that the overall statutory framework for withholding of removal reflects Congress's desire to prevent "refoulement" of noncitizens to countries where they may face torture. *Mulanga v. Ashcroft*, 349 F.3d 123, 134 (3d Cir. 2003) (quoting *In Re S-M-J-*, 21 I. & N. Dec. 722, 723–26 (BIA 1997)).[2]

---

[1] This regulation was promulgated in response to the 1998 Foreign Affairs Reform and Restructuring Act (FARRA), in which Congress declared, "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States." Pub. L. 105–277, div. G, § 2242, 112 Stat. 2681, 2681–822 (codified as note to 8 U.S.C. § 1231). *See Khouzam v. Att'y Gen. of U.S.*, 549 F.3d 235, 241–44 (3d Cir. 2008) (reviewing FARRA's legislative history and noting Congress's substantial mirroring of the U.N.'s forbidding of any state to "expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.").

[2] Moreover, the Supreme Court has also pointed to the variety of "individualized remedies" available to aliens under the statutes and regulations, noting that "if aliens would face persecution or other mistreatment in the country designated under § 1231(b)(2), they have a number of available remedies: asylum, § 1158(b)(1); withholding of removal, § 1231(b)(3)(A); relief under an international agreement prohibiting torture, *see* 8 CFR §§ 208.16(c)(4), 208.17(a) (2004); and temporary protected status." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005).

In a case for revocation under § 1231(a), there is at least one place where such objections are certainly salient: the informal interview required by 8 C.F.R. §§ 241.13 and 241.4(l).  As emphasized above, although revocation under § 241.13 may be based on changed circumstances, the informal interview must present a meaningful chance to respond to the Government's reasons for revocation.  Where the changed circumstance is the availability of a third country, the suitability of that country undeniably matters. To let the Government deport aliens to third countries without giving them the chance to raise these objections would result in a legally fraught tension within § 1231, effectively allowing § 1231(a)'s regulations' language about "changed circumstances" to nullify § 1231(b)'s guidelines governing third-country destinations.  And it would simultaneously drain §§ 241.13 and 241.4's procedural rules of their own meaning. [3]

The only reasonable reading is to construe §§ 1231(a) and (b) together and conclude that Mr. Youboty needed to know he was going to Ghana so that he could raise objection to it.  *See D.V.D. v. U.S. Dep't of Homeland Sec.*, 821 F. Supp. 3d 102, 132–33 (D. Mass. 2026), *appeal pending* (1st Cir. Feb. 28, 2026), *underlying case stayed* 145 S. Ct. 2153 (Mem.) (2025), *stay clarified* 145 S. Ct. 2627 (2025) (acknowledging "the legal impossibility of raising hypothetical" objections about a third country when the alien does not know what the intended destination is).

The suitability of Ghana involves more than its diplomatic representations of how *it* would treat persons admitted pursuant to its treaty with the United States.  It involves Ghana's future intentions with respect to those it admits, specifically, whether it will permit them to stay, or return

---

[3] In contrast to the tension of trying to read § 1231(a)'s revocation steps without regard to § 1231(b)'s third-country steps, the Supreme Court has confirmed that managing and carrying out final orders of removal can easily coexist with respecting third-country procedures, such as Convention Against Torture claims. *See Nasrallah v. Barr*, 590 U.S. 573, 582 (2020) ("As the Government acknowledges, a CAT order does not disturb the final order of removal.  An order granting CAT relief means only that, notwithstanding the order of removal, the noncitizen may not be removed to the designated country of removal, at least until conditions change in that country.").

them to their country of origin where they are at risk.  In *Mulanga*, *supra*, the Third Circuit recognized that Congress prohibits the "refoulement" of refugees with valid asylum and withholding claims.  349 F.3d at 134.  How then should courts consider fear of refoulement that occurs further down the chain of immigration?[4]

In the case of Ghana, it has been alleged that deportees it admits under its treaty with the United States are quickly repatriated to their home countries, recently sparking litigation in a regional West African Court, the ECOWAS Community Court of Justice. [5]  The case was brought by a group of migrants who allege that Ghana took action to return them to their countries of origin despite fear of persecution that prevented their direct repatriation by the United States.[6]  The merits of that dispute, and whether such concerns suffice to prevent Mr. Youboty's removal to Ghana, are not within this Court's purview.  But these issues are identified here to underscore that from the perspective of due process, identification of the country to which one will be removed is no small, technical detail.

In conclusion, the procedures followed by ICE in revoking the order of release do not comport with due process, rendering Mr. Youboty's removal unlawful at this time.

     /s/ Gerald Austin McHugh
United States District Judge

---

[4] *See Tanha v. Warden, Baltimore Det. Facility*, No. 25-2121, 2025 WL 2062181, at \*3 (D. Md. July 22, 2025) (concluding blanket assurances provide no protection against situations "whereby the third country proceeds to return an individual to his country of origin."); *see also Mbaba v. Perez*, No. 26-0070, 2026 WL 917484 (S.D. Tex. Feb. 13, 2026) (granting preliminary injunction against deportation to third country where third country passed eight out of nine aliens sent there onto their home countries).

[5] The Court was established pursuant to a treaty establishing the Economic Community of West African States.  https://courtecowas.org/.

[6] *27 Protected Migrants v. The Republic of Ghana,* ECW/CCJ/APP/ ____26.